FOURTH DIVISION

May 13, 2004

No. 1-02-3851

MARY PIETRO, Individually and as )   Appeal from

Independent
 Executor of the Estate ) the Circuit Court

of Raymond Morman
, Deceased, ) of Cook County.

)

Plaintiff-Appellee,
 )

v. ) No. 01 L 3838

)

MARRIOTT SENIOR LIVING SERVICES, INC. )

d/b/a Marriott Brighton Gardens of )

Hoffman Estates, and ODESSA McARDLE, )    

) 

Defendants )   Honorable

) Diane J. Larsen,

(J. Scott Myers, Contemnor - Appellant). ) Judge Presiding.

JUSTICE THEIS delivered the opinion of the court:

J. Scott Myers, attorney for defendants, Marriott Senior Living Services, Inc., d/b/a Marriott Brighton Gardens of Hoffman Estates (Marriott) and Odessa McArdle, appeals from an order of the circuit court which held him in contempt for refusing to produce certain documents demanded by plaintiff, Mary Pietro, during discovery.  Defense counsel was assessed a $100 fine for his refusal to comply with the court's order.  On appeal, counsel contends that the requested documents are protected under the Code of Civil Procedure (Medical Studies Act or the Act) (735 ILCS 5/8-2101 
et
 
seq
. (West 2002)) and the attorney-client privilege (166 Ill. 2d R. 201).  For the following reasons, we affirm the circuit court's ruling with respect to the documents and vacate the finding of contempt.

BACKGROUND

Plaintiff brought this action against defendants Marriott and McArdle 
to recover damages resulting from their alleged negligence in rendering care to plaintiff's father, Raymond Morman, while he was a resident at Marriott’s assisted living facility.   Plaintiff alleged that defendants failed to provide necessary emergency medical care, including cardiopulmonary resuscitation, and failed to call 911 for assistance.  Sohail Agha, a resident assistant, and Laura Dudek-Konar, a nurse, were also named as respondents in discovery.
(footnote: 1)  During the course of written discovery, plaintiff sought the production of various documents.  Defendants objected, asserting that these documents were privileged under the attorney-client privilege and the Act (735 ILCS 5/8-2101 
et
 
seq
. (West 2002))
.  The documents at issue on appeal include witness statements from McArdle, Dudek-Konar, and Agha, as well as three other documents referred to as documents 2, 14, and 137.
 

Defendants filed a privilege log which the court initially held to be insufficient.  Subsequently, they were granted leave to file an amended log.  According to the amended log, the documents are all contained in McArdle's personnel or confidential personnel file.  Defendants asserted that the handwritten statements of McArdle and Agha were generated during the course of a peer review.  No privilege was asserted with respect to any statement of Dudek-Konar.  It was asserted that document 2 was an undated, handwritten note, authored in contemplation of litigation and protected by the attorney-client privilege.  With respect to document 14, it was asserted that it was an unidentified handwritten note created on June 28, 2000, and protected by the attorney-client privilege.  It was further stated that document 137 was preliminary research of events generated during the course of a peer review and in contemplation of litigation.  No author or date was provided in the log for this document.
    

Defendants also supported their assertions of privilege with affidavits from the following individuals: Diana Barthel, the general manager and administrator of Marriott; Ruth Raine, a special service supervisor for Marriott's claim services department; and McArdle, Dudek-Konar, and Agha.  According to Barthel's affidavit, she was responsible for investigating all incidents which occurred at the facility and reporting the results of said investigations to Marriott's risk management/in-house legal department with her analysis.  She stated that in accordance with Marriott's risk management policy and as a member of its quality assurance committee, she requested that McArdle, Dudek-Konar, and Agha prepare written statements regarding their involvement in Mr. Morman's care on the date of the occurrence.  The purpose for the written statement was "to protect the interests of Marriott and its employees should a lawsuit be filed," and for quality assurance purposes.  Additionally, she stated that the statements were reviewed by other department heads at Marriott who are also members of its quality assurance committee.  With respect to documents 2 and 14, she stated that they were prepared by Beth Hovius, Marriott’s assisted living manager.  These documents were included in McArdle's personnel file at Barthel's direction during the course of her investigation and in contemplation of litigation.

According to Raine's affidavit, it was the policy of Marriott's claim services department to defend and indemnify its employees against litigation arising out of the scope of their employment.  She stated that the department relied upon the analysis and opinions of Barthel when formulating its position regarding this occurrence and the anticipated litigation.  She further stated that Marriott selected a law firm to protect the interests of Marriott and its employees in accordance with its risk management policy.  

McArdle, Dudek-Konar, and Agha filed identical affidavits.  Therein, they stated that on May 30, 2000, the morning of the incident, Barthel asked them to prepare a written statement regarding their involvement in Mr. Morman's care on the date of the occurrence.  They further stated that they "understood this request was made for quality assurance purposes and because Marriott anticipated litigation resulting from this incident."  It was also their understanding that "Barthel would forward same to Marriott's Risk Management/In-House Legal Department for the protection of both Marriott and [their] interests in the event a lawsuit was filed."

The trial court was also supplied with the deposition testimony of Barthel and Raine.  According to Barthel's deposition, members of the quality assurance committee, also known as the resident care committee, reviewed the statements together on the day of the incident.  The statements were prepared prior to their meeting, and no formal committee ever met.  Raine testified that Marriott had a self-insured retention under its liability policy in the amount of $100,000.

O
n November 19, 2002, after an 
in
 
camera
 inspection, the trial court held a hearing on the disputed documents.  The court held that defendants failed to establish a privilege under the Act as to the witness statements of McArdle, Dudek-Konar and Agha.  The court found that the privilege log lacked elements necessary to assert such a privilege.  Additionally, the court found that the statements at issue were generated prior to any quality assurance committee meeting and that there was no evidence of a request by the committee for the information.  The court further found that McArdle, Dudek-Konar and Agha admitted knowledge that the statements they made would be shared with others for quality assurance purposes.  The court held that such knowledge defeated the attorney-client privilege because the witnesses had no expectation of privacy.  

With respect to documents 2 and 14, the trial court found that the attorney-client privilege was waived by Marriott's placement of these materials in McArdle's personnel file.  With respect to document 137, the trial court found that the amended privilege log was inadequate and lacked the requisite information to sustain defendants' burden of proof.  After the trial court ruled, defense counsel refused to produce the disputed documents and was held in contempt of court and fined $100.  Defense counsel timely appealed.

ANALYSIS

Medical Studies Act Privilege

Initially, we consider plaintiff's contention that the Act does not apply to Marriott because, as an assisted living facility, it is not one of the enumerated entities protected under the statute.  The issue of whether an assisted living facility falls within the purview of the Act is one of first impression in the state.  In answering that question, we are guided by the rules of statutory construction.  
The primary goal of statutory construction is to ascertain and give effect to the 
intent of the legislature, and the most reliable indication of the legislature's 
intent is the plain 
language of the statute.
  
Metzger v. DaRosa
, 209 Ill. 2d 30, 34-35, 805 N.E.2d 1165, 1167 (2004).  
When the statute's language is clear, it will be given effect without resort to other aids of statutory construction
.  
Metzger
,  209 Ill. 2d at 35, 
 805 N.E.2d at 1167.   
This court will not depart from the plain language of a statute by reading into it exceptions, limitations or conditions that conflict with the express legislative intent.  
Petersen v. Wallach
, 198 Ill. 2d 439, 446, 764 N.E.2d 19, 23 (2002).  Statutory construction is a question of law subject to 
de
 
novo
 review.  
Metzger
,  209 Ill. 2d at 34, 
 805 N.E.2d at 1167. 
      

 The Act provides in relevant part:

“All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner’s professional competence, or other data of the Illinois Department of Public Health, local health departments, the Department of Human Services * * *, the Mental Health and Developmental Disabilities Medical Review Board, Illinois State Medical Society, allied medical societies, health maintenance organizations, medical organizations under contract with health maintenance organizations or with insurance or other health care delivery entities or facilities, tissue banks, organ procurement agencies, physician-owned insurance companies and their agents, committees of ambulatory surgical treatment centers or post-surgical recovery centers or their medical staffs, or committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but no medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services * * *.  735 ILCS 5/8-2101 (West 2002).

The Act further provides that such privileged material “shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person.”  735 ILCS 5/8-2102 (West 2002).

Plaintiff is correct that the Act does not protect all information used for quality control, but only that information belonging to certain entities and categories of organizations.  
Niven v. Siqueira
, 109 Ill. 2d 357, 365, 487 N.E.2d 937, 941 (1985).  Defense counsel argues that while an assisted living facility is not expressly named in the statute, it is encompassed under a catchall category of "other health care delivery entities or facilities."  We disagree with counsel's construction of the statute.  A correct grammatical reading of the statute indicates that the legislature intended to include within its scope a series of entities and organizations, and has chosen to separate each of them by the use of a comma. When viewed in this context, the statute does not protect data of "other health care delivery entities or facilities."  Rather, it protects data of "
medical organizations under contract with 
* * * other health care delivery entities or facilities."  (Emphasis added.)
 735 ILCS 5/8-2101 (West 2002).  Marriott agrees that it is not a medical organization under contract with a health care delivery facility.  As such, under the plain language of the statute, Marriott does not fall within the scope of the Act.

Additionally, we find that the historical and statutory notes provide support for our interpretation.  On numerous occasions, the legislature has chosen to amend the Act to include additional entities within its purview.  See, 
e.g
., Public Act 83-1001 (Pub. Act 83-1001, eff. July 1, 1984) (added data of the Illinois Department of Mental Health and Developmental Disabilities); Public Act 84-544 (Pub. Act 84-544, eff. January 1, 1986) (added data of health maintenance organizations and medical organizations under contract with health maintenance organizations); Public Act 84-902 (Pub. Act 84-902, eff. January 1, 1986) (added data of the Mental Health and Developmental Disabilities Medical Review Board); Public Act 89-393 (Pub. Act 89-393, eff. August 20, 1995) (included data of tissue banks and organ procurement agencies).  Had the legislature intended to include health care facilities such as nursing homes, long-term care facilities, or assisted living facilities within its purview, it could have done so explicitly.  

Indeed, the legislature has addressed the privileged nature of quality assurance information at these types of facilities under other specific statutory schemes.  For example, section 4 of the 
Long-term Care Peer Review and Quality Assessment and Assurance Protection Act (745 ILCS 55/4 (West 2002)) provides that proceedings and communications of peer review or quality control committees of long-term care providers are privileged and confidential.    However, under the Assisted Living and Shared Housing Act (210 ILCS 9/1 
et
 
seq. 
(West 2002)), which regulates assisted living facilities, the legislature has made no provision regarding the privileged nature of quality assurance information.  Accordingly, the legislature intended to address these types of facilities distinctly from those encompassed under the Medical Studies Act.  For all of the foregoing reasons, assisted living facilities are not covered entities under the Act.

Even if we were to find that the legislature intended to include assisted living facilities under the Act,  Marriott's resident care committee is not consistent with the type of committee envisioned by the Act.  The purpose of the Act is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of improving the quality of health care.  
Roach v. Springfield Clinic
, 157 Ill. 2d 29, 40, 623 N.E.2d 246, 251 (1993).  The Act is premised on the belief that, absent the privilege, health care practitioners would be reluctant to engage in frank evaluation of their colleagues.  
Roach
, 157 Ill. 2d at 40, 623 N.E.2d at 251.  Thus, the Act does not protect information of any type of quality control group found in any corporate setting but, rather, specific committees capable of evaluating patient care. 

 Here, while there were two nurses who were members of the resident care 
committee, the other
 members included a corporate administrator, a director of food and beverages, a director of facilities management, and other people as needed.  Accordingly, while individual nurses may have been capable of peer review, this particular committee was not qualified to provide professional self-evaluation or render opinions regarding the adequacy of the patient care rendered to Mr. Morman as envisioned by the Act. 
 

Furthermore, t
he Act does not protect all information used for internal quality control.  Information initiated, created, prepared or generated by a peer-review committee is privileged under the Act, even if later disseminated outside the peer-review process.   
Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc.
, No. 1-03-0936 (March 29, 2004).  However, a document generated in the ordinary course of a hospital's medical business, or for the purpose of rendering legal opinions or to weigh potential liability risk or for later corrective action is not privileged even if later used by a committee in the peer-review process.  
Webb
, 1-03-0936
; 
Chicago Trust Co. v. Cook County Hospital
, 298 Ill. App. 3d 396, 406, 698 N.E.2d 641, 649 (1998).  Accordingly, the Act protects against disclosure of the mechanisms of the peer review process, including information gathering and deliberations leading to the ultimate decision rendered by a peer-review committee, but does not protect against the discovery of information generated before the peer-review process begins or information generated after the peer-review process ends.
  
Webb
, No. 1-03-0936
; 
Chicago Trust Co.
, 298 Ill. App. 3d at 406, 698 N.E.2d at 649
; 
Grandi v. Shah
, 261 Ill. App. 3d 551, 556, 633 N.E.2d 894, 898 (1994).     

          The burden of establishing the applicability of the privilege rests with the party seeking to invoke the privilege.  
Roach
, 157 Ill. 2d at 41, 623 N.E.2d at 251.  Whether the privilege applies is generally a matter of law reviewed 
de
 
novo
, but the question of whether specific materials are part of the peer-review process under the Act is a factual question within that legal determination and will not be reversed on review unless it is against the manifest weight of the evidence.  
Niven
, 109 Ill. 2d at 368, 487 N.E.2d at 943; 
Chicago Trust Co.
, 298 Ill. App. 3d at 401, 698 N.E.2d at 645.

Defense counsel contends that the written statements of McArdle, Dudek-Konar and Agha were privileged under the Act because they were "secured for purposes of quality assurance and for the evaluation and improvement of patient care."  Additionally, counsel contends that document 137 was privileged because it was prepared "in conjunction with the quality assurance committee's proceedings."  The record is silent as to when, if ever, the quality assurance committee formally met for purposes of rendering opinions regarding this incident.  The only information provided reflects that the documents were made part of McArdle’s personnel file and that, at the time the statements were prepared, no formal committee had convened.  Nor was there any evidence presented that the 
committee
 requested these statements.  Barthel's affidavit stated that the witness statements were "reviewed" by "members" of the quality assurance committee
 and that she shared the "results" of her investigation into the incident with the committee.  Therefore, it was not against the manifest weight of the evidence for the trial court to find that the statements were not "part of" the internal quality control process.

Our courts have repeatedly distinguished between nonprivileged information reported to a committee and privileged information generated by or requested by a committee.  See, 
e.g.
, 
Chicago Trust Co.
, 298 Ill. App. 3d at 402, 698 N.E.2d at 646 (reports prepared shortly after incident and used by oversight committee to review incident were not privileged where reports were not requested by, and therefore did not belong to, a committee engaged in the peer-review process);  
Roach
, 157 Ill. 2d at 41-43, 623 N.E.2d at 251-52 (investigation by chief of anesthesiology was not tantamount to investigation by a committee; a committee is comprised of a body or group of persons, not just a single individual).  
Accordingly, where the statements were not initiated, created or generated by the quality assurance committee, defendants have failed to establish that the privilege is applicable to the statements of McArdle, Dudek-Konar and Agha. 

With respect to document 137, no information was provided as to the author of the document or when the document was prepared or by whom the document was prepared.  Supreme Court Rule 201(n) (166 Ill. 2d R. 201(n))
 requires that the privilege log describe "the nature of the documents * * * not produced or disclosed" and "the exact privilege which is being claimed."   The burden was on Marriott to establish why the Act was properly invoked. 166 Ill. 2d R. 201(n).  Without this information, it was not unreasonable for the trial court to find that there was insufficient information on which to base a privilege under the Act.  Furthermore, the trial court had an opportunity to view the document 
in
 
camera
 and the document does not indicate by whom it was prepared or to whom it was addressed.    

 Attorney-Client or Insurer-Insured Privilege 

Defense counsel contends that the statements of McArdle, Dudek-Konar and Agha are protected by the attorney-client privilege or the insurer-insured privilege.  Supreme Court Rule 201(b)(2) provides, in pertinent part: 

 "All matters that are privileged against disclosure on the trial, including privileged communications between a party or his agent and the attorney for the party, are privileged against disclosure through any discovery procedure. Material prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney." 166 Ill. 2d R. 201(b)(2). 

  The attorney-client privilege exists for the purpose of encouraging and promoting the full and frank consultation between a client and his or her legal advisor by removing the fear of compelled disclosure of information.  
Consolidation Coal Co. v. Bucyrus-Erie Co.
, 89 Ill. 2d 103, 117-18, 432 N.E.2d 250, 256 (1982).  The privilege is an exception to the duty to disclose.  
Consolidation Coal Co.
, 
89 Ill. 2d at 117-18, 432 N.E.2d at 256. 
 The party claiming the attorney-client privilege bears the burden of presenting factual evidence that establishes the privilege.  
Cox v. Yellow Cab Co.
, 61 Ill. 2d 416, 419-20, 337 N.E.2d 15, 17 (1975).  To be entitled to the protection of the attorney-client privilege, a claimant must show that (1) the statement originated in confidence that it would not be disclosed; (2) it was made to an attorney acting in his legal capacity for the purpose of securing legal advice or services; and (3) it remained confidential.  
Rounds v. Jackson Park Hospital & Medical Center
, 
319 Ill. App. 3d 280, 285-86, 745 N.E.2d 561, 566
 (2001); 
Hyams v. Evanston Hospital
, 225 Ill. App. 3d 253, 257-58, 587 N.E.2d 1127, 1130 (1992).

Our supreme court has also stated that this privilege extends to communications between an insurer and an insured, where the insurer is under an obligation to defend the insured.  
People v. Ryan
, 30 Ill. 2d 456, 461, 197 N.E.2d 15 (1964); see also 
Chicago Trust Co.
, 298 Ill. App. 3d at 407, 698 N.E.2d at 649; 
Claxton v. Thackston
, 201 Ill. App. 3d 232, 235, 559 N.E.2d 82, 85 (1990); 
Ekstrom v. Temple
, 197 Ill. App. 3d 120, 130, 553 N.E.2d 424, 430 (1990). 
 In 
Ryan
, the supreme court held that a communication given by an insured to its insurance company's investigator retained its privileged character.  
Ryan
, 30 Ill. 2d at 460-62, 197 N.E.2d at 17-18.  The court reasoned that the liability carrier usually selects the attorney under a common liability contract.  Thus, "the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured."  
Ryan
, 30 Ill. 2d at 461, 197 N.E.2d at 18; 
Chicago Trust Co.
, 298 Ill. App. 3d at 407, 698 N.E.2d at 651.

In this context, it has been stated that to extend the attorney-client privilege, the party asserting the privilege must prove: (1) the identity of the insured; (2) the identity of the insurance carrier; (3) the duty to defend a lawsuit; and (4) that a communication was made between the insured and an agent of the insurer.  
Chicago Trust Co.
, 298 Ill. App. 3d at 407, 698 N.E.2d at 649.   
   
    

Here, defense counsel maintains that Marriott and its employees are entitled to extend the privilege based upon Marriott's status as a self-insurer with a self-insured retention of $100,000.   He maintains that where Marriott has a duty to defend its employees against any litigation arising out of the scope of their employment, the witness statements are confidential communications between an insured (employees McArdle, Dudek-Konar and Agha) and its insurer (Marriott).  Defendants presented an affidavit from Marriott's claims handler stating that Marriott has a duty to defend its employees.  They also provided the court with a copy of Marriott's insurance policy endorsement which states that Marriott employees are additional insureds under the policy while acting within the scope of their duties.   

The question of whether the privilege applies to an insured's communication to a self-insurer rather than an insurance carrier has never been squarely addressed in Illinois.  While the issue has been raised, the court has based its decision on other grounds.  See, e.g., 
Chicago Trust Co.
, 298 Ill. App. 3d at 410, 698 N.E.2d at 651 (hospital failed to show that documents were drafted to protect the insured's own interests); 
Rounds
, 319 Ill. App. 3d at 287, 745 N.E.2d at 568 (issue waived for failure to raise it in the trial court); 
Buckman v. Columbus-Cabrini Green Medical Center
, 272 Ill. App. 3d 1060, 1066, 651 N.E.2d 767, 771 (1995) (court applied attorney-client privilege instead where hospital's attorney acted directly as nurse's attorney in rendering legal advice and services).

Here, we need not determine whether defendants are entitled to extend the privilege to a self-insurer because defendants failed to meet the threshold burden of proving that the statements remained confidential. 
 McArdle, Dudek-Konar and Agha never stated in their affidavits that they intended their statements to remain confidential.  They knew that their statements were not only prepared for transmittal to the risk management/in-house legal counsel, but were prepared for purposes of quality control. 
 
As such, these employees knew that their actual statements would not remain confidential with access only provided to the claims administrators, risk managers/in-house counsel or outside counsel.  
By disseminating these statements outside these confines, these employees had no expectation of privacy, a necessary element of the attorney-client privilege and its offshoot, the insurer-insured privilege.  
To allow a broader scope of dissemination would effectively swallow the rule, which provides for liberal discovery.  
Buckman
, 272 Ill. App. 3d at 1066, 651 N.E.2d at 771 (
"[b]ecause it is the privilege, not the duty to disclose, that is the exception, the privilege ought to be strictly confined within its narrowest possible limits").
 
 Accordingly, 
we find that the documents did not remain privileged.      

We next address defense counsel's argument that documents 2, 14, and 137 are privileged because they were prepared in contemplation of litigation.  According to Barthel's affidavit, documents 2 and 14 were prepared by Beth Hovius, Marriott’s assisted living manager, and were included in McArdle's personnel file at Barthel's direction during the course of her investigation and in contemplation of litigation.
  As stated in 
Ryan
, the privilege applies where the communication is made by the insured to the insurer or its agent for the dominant purpose of protecting the interests of the insured.  
Ryan
, 30 Ill. 2d at 460-61, 197 N.E.2d at 18
.  

Here, it has not been shown that these documents were drafted by Hovius (the insured) in order to protect her interests.  See 
Chicago Trust Co.
, 298 Ill. App. 3d at 410, 698 N.E.2d at 651.  Indeed, an 
in
 
camera
 review of these documents reveals that the purpose was not to protect the interests of the insured.  Additionally, these documents did not remain confidential where Marriott placed them in McArdle’s personnel file.  With respect to document 137, defendants have not met their burden of proof to establish the necessary elements of the privilege where there is no information as to who authored the document, and to whom it was sent.  Accordingly, the trial court did not err in ordering that defendants produce documents 2, 14, and 137.       

Contempt Order

Lastly, we address the court's contempt order.  The record reveals that defense counsel's conduct was not contemptuous and that the trial court entered the contempt order at counsel's request as the proper procedure to seek immediate appeal of a trial court's discovery order.  
Buckman
, 272 Ill. App. 3d at 1067, 651 N.E.2d at 771.  Therefore, we vacate the trial court's contempt order and fine of $100.  
Berry v. West Suburban Hospital Medical Center
, 338 Ill. App. 3d 49, 57, 788 N.E.2d 75, 81 (2003). 

Accordingly, for the foregoing reasons, we affirm the trial court's ruling with respect to the disputed documents at issue on appeal and vacate the trial court's contempt order.  

Affirmed in part; vacated in part. 

QUINN, P.J. and GREIMAN, J., concur.   

 

  

    

 

FOOTNOTES
1: On July 15, 2003, these individuals were converted from respondents in discovery to defendants.